2010 ME 30

**STATE of Maine**

v.

**Geoffrey Demond REESE.[1]**

Supreme Judicial Court of Maine.

Argued: Feb. 10, 2010.

Decided: April 1, 2010.

---

**1.** The defendant's middle name was spelled "Damond" in the indictment, but it appears from the record that the correct spelling is "Demond."

Anna T. Collins, Esq., Robert C. Andrews, Esq. (orally), Portland, ME, for Geoffrey Demond Reese.

Mark W. Lawrence, District Attorney, Justina A. McGettigan, Asst. Dist. Atty., Anne Marie Pazar, Esq. (orally), Alfred, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

SILVER, J.

[¶ 1] Geoffrey Demond Reese appeals from a judgment of conviction entered by the Superior Court (York County, *Fritzsche, J.*) after a jury found him guilty of elevated aggravated assault (Class A), 17–A M.R.S. § 208–B(1)(A) (2009), and aggravated assault (Class B), 17–A M.R.S. § 208(1)(B) (2009); and after the court found him guilty of possession of a firearm by a prohibited person (Class C), 15 M.R.S. § 393(1)(A–1)(3) (2009). Reese was also granted leave, pursuant to M.R.App. P. 20 and 15 M.R.S. § 2151 (2009), to appeal his sentence, which was twenty-nine years, with no portion of the sentence suspended, on the elevated aggravated assault conviction. We affirm the judgment and the sentence.

## I. BACKGROUND

[¶ 2] Viewing the evidence admitted at trial in the light most favorable to the State, *see State v. Bruzzese*, 2009 ME 61, ¶ 10, 974 A.2d 311, 313, the jury could have found the following facts. Early in 2008, Reese and the victim moved to Maine from Texas and were living in a motel room in Old Orchard Beach. Although Reese was a convicted felon who was prohibited from owning a firearm, at his request the victim bought a nine-millimeter gun in December 2007. Reese kept the gun loaded with full-metal-jacket bullets and hollow-point bullets which make particularly severe and penetrating injuries. Reese had previously threatened to kill the victim and had discharged the gun about six feet from her into a floor. Reese also took the victim to buy a shovel which he kept in the trunk of their rental car and told her that he intended to bury her with it.

[¶ 3] On May 3, 2008, the victim finished her shift work as a nurse and returned to the motel room where she got into an argument with Reese. In the early hours of the next morning Reese told the victim to go with him to buy cigarettes. Although the victim feared for her life at that point, she felt she had to comply. During the drive back from the store Reese became enraged. He pulled the car over, hit the victim's head against the window, ordered her to get out, and reached for the gun. Reese shot at her nine times as she tried to get away. Two of Reese's shots struck the victim, one in the back and the other under the arm, inflicting life-threatening injuries. Reese left the victim collapsed next to the road and drove back to the motel. A passing motorist saw her lying in the road, stopped, and summoned emergency assistance. The victim told a law enforcement officer that Reese shot her and she gave the officer the name of the motel where they had been staying. She subsequently underwent emergency surgery, followed by an extended hospital stay, and survived.

## II. DISCUSSION

A. Reese's Motion to Suppress

■ [¶ 4] Before trial, Reese moved to suppress several statements and the evidence seized in a search of his motel room pursuant to a search warrant. The court (*Brennan, J.*) denied his motion. Reese makes several arguments on appeal. We review the denial of a motion to suppress for clear error as to factual findings and de novo as to issues of law. *State v. DiPietro*, 2009 ME 12, ¶ 13, 964 A.2d 636, 640; *State v. Lockhart*, 2003 ME 108, ¶ 15, 830 A.2d 433, 441.

1. Reese's Statement in the Patrol Car

■ [¶ 5] An officer drove by the motel and observed Reese exiting one of the

motel rooms carrying a clear plastic trash bag which he threw into the motel dumpster. When the bag was later recovered it contained some items that were identified as the victim's possessions. Reese appeared to lock himself out of his room. An officer asked Reese his name, told him he was being detained, handcuffed him, and placed him in the back seat of a patrol car. When the officer who supervised the investigation arrived, he opened the back door to the patrol car and explained to Reese that he was being detained due to an investigation involving the victim. Reese responded: "We broke up, and I haven't seen her in two weeks." No questions were asked of Reese at that point.

[¶ 6] Reese argues that the court erred in holding that his statement in the patrol car was not the product of an interrogation. In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that the state may not use a defendant's statements "stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444, 86 S.Ct. 1602. We have held that a court's conclusion that a law enforcement officer's comment did not constitute interrogation "will be upheld unless the evidence shows that a contrary inference was the only reasonable conclusion that could have been drawn." *State v. Smith*, 612 A.2d 231, 233 (Me. 1992) (quotation marks omitted). Reese's statement in the patrol car was not the product of an interrogation. *See id.*

2. Reese's Statements During Booking

■ [¶ 7] After Reese was arrested, he was taken to an interview room at the Saco Police Department and given a *Miranda* warning. He responded that he wanted to speak with an attorney and did not want to answer questions. He was then taken to another room where the same officer asked him a series of questions for booking. One of those questions was whether he had with him any form of identification to verify the personal information he had provided. The officer also may have asked him where the identification was. Reese responded that his identification was in his motel room or in a rental vehicle parked at the motel. The officer did not ask Reese any questions about the rental vehicle or the motel room. He asked Reese whether he had a criminal history and Reese replied that he did not.

■ [¶ 8] Reese argues that the questions he was asked during booking about his identity and criminal record violated his right to remain silent and to have an attorney, pursuant to the Fifth and Sixth Amendments to the United States Constitution. We have held that brief, neutral questions that are not part of an effort to elicit a confession or admission do not constitute interrogation. *State v. Estes*, 418 A.2d 1108, 1111 (Me.1980); *State v. Simoneau*, 402 A.2d 870, 873 (Me.1979). This includes questions intended to obtain the data pertinent to the defendant's identity and necessary for booking. *Estes*, 418 A.2d at 1111. The questions asked of Reese during booking, including his criminal record, were routine and related to identity only. There is no evidence that the officer was trying to elicit a confession or admission. We agree with the reasoning set forth in the recommended decision in *United States v. Hopkins*, 2005 U.S. Dist. Lexis 6058, at *13–14 (citing *United States v. Foster*, 227 F.3d 1096, 1102–03 (9th Cir.2000); and *United States v. Mitchell*, 58 F. App'x 14, 16 (4th Cir.2003) (per curiam) (unpublished)), that booking questions may be asked either before or after the *Miranda* warning.

#### 3. The Missing Probable Cause Affidavit

[¶ 9] A search of Reese's motel room pursuant to a search warrant yielded the gun, ammunition, and other items linked to the crime. It is undisputed that at the time of the suppression hearing the probable cause affidavit for the motel room search was not among the search warrant documents on file in the District Court. Pursuant to M.R.Crim. P. 41, both the officer responsible for executing the search warrant and the court have responsibilities with respect to the filing of the probable cause affidavit and the other search warrant documents. The State was unable to explain why the affidavit was absent from the court file. The officer who executed the search warrant only became aware of the absence many months after the documents were filed.

[¶ 10] At the suppression hearing the court admitted testimony over Reese's objection from the District Court judge who reviewed the affidavit and request for a search warrant. The judge's testimony was admitted solely to prove that there was an affidavit presented with the request for a warrant. The court also admitted the testimony of the law enforcement officer who presented the affidavit and request for a warrant to the judge. The officer testified that he remembered drafting an affidavit on his desktop computer, presenting it to his supervisor for review, and then going with another officer to present the affidavit and request for a search warrant to the judge. The next day the officer used the information from the affidavit for the motel room search warrant to draft an affidavit and request for a search warrant for Reese's rental vehicle. The affidavits for the two searches were identical in all respects pertinent to the probable cause facts common to both searches except that the affidavit for the vehicle search identified the officer who observed an empty bullet casing in plain view in the rental vehicle. The observation itself was described in both affidavits. The court admitted both the properly-filed affidavit for the search of the rental vehicle and the copy of the original affidavit for the search of the motel room.

[¶ 11] Pursuant to article 1, section 5 of the Maine Constitution and the Fourth Amendment to the United States Constitution, search warrants must be based on probable cause and "supported by oath or affirmation." A probable cause affidavit, when properly returned and filed pursuant to M.R.Crim. P. 41, creates a record that permits judicial review. *See* 15 M.R.S. § 55 (2009). Reese argues that review of a search warrant is impossible when no probable cause affidavit has been filed as required. We disagree. Meaningful appellate review requires proof that the judge reviewed the affidavit and the request for the warrant simultaneously, *see State v. Gamage,* 340 A.2d 1, 7 (Me.1975); *State v. Stone,* 322 A.2d 314, 317 (Me. 1974), and proof that there were grounds for probable cause, *see State v. Hollander,* 289 A.2d 419, 421 (Me.1972). We decline to invalidate a warrant due to a lost affidavit when the existence and contents of the pertinent language in the affidavit can be proved, as they were here, in a manner sufficient to permit meaningful review. *See People v. Galland,* 45 Cal.4th 354, 86 Cal.Rptr.3d 841, 197 P.3d 736, 746–47 (2008) and cases cited therein.

[¶ 12] We note that the District Court judge's testimony appears not to have been necessary because the law enforcement officer testified that he presented the judge with both the affidavit and the request for a search warrant at the same time. It would have been better practice on the part of the State not to have called the judge to testify so as not to put the

judge in the position of being a witness in the proceeding. However, the admission of the judge's testimony at the suppression hearing did not prejudice Reese. *See* M.R. Evid. 403.

## B. Expert Testimony

■ [¶ 13] At trial Reese objected on the basis of unfair surprise to the introduction of expert testimony from which the jury could have concluded that the bullets that penetrated the victim's jacket were not fired at close range. This testimony undermined Reese's assertion that he shot at the victim inside the car in self-defense. The expert's report which was provided to Reese in advance of the trial stated that the victim's jacket was examined and chemically processed for the presence of copper and lead. The report did not indicate the conclusions drawn from the testing. At trial the expert testified that the presence of copper and lead indicated that the holes in the jacket were caused by bullets. She also testified that the presence of gunpowder residue on the jacket would have suggested that the bullets were fired at close range, but she did not detect any gunpowder residue.

■ [¶ 14] We review the trial court's decision regarding an alleged discovery violation for abuse of discretion, *State v. Allen,* 2006 ME 20, ¶ 12, 892 A.2d 447, 451. The discovery violation must prejudice the defendant to the extent that it deprived him of a fair trial. *State v. Mannion,* 637 A.2d 452, 454 (Me.1994). We find no abuse of discretion.

[¶ 15] We find Reese's remaining arguments on direct appeal to be without merit.

## C. The Sentence

### 1. General Provisions for Sentencing

[¶ 16] When imposing a sentence, the court is required to follow the three-step process set forth in 17–A M.R.S. § 1252–C (2009) to determine the appropriate length of imprisonment. Section 1252–C states:

In imposing a sentencing alternative pursuant to section 1152 that includes a term of imprisonment relative to murder, a Class A, Class B or Class C crime, in setting the appropriate length of that term as well as any unsuspended portion of that term accompanied by a period of probation, the court shall employ the following 3–step process:

1. The court shall first determine a basic term of imprisonment by considering the particular nature and seriousness of the offense as committed by the offender.

2. The court shall next determine the maximum period of imprisonment to be imposed by considering all other relevant sentencing factors, both aggravating and mitigating, appropriate to that case. These sentencing factors include, but are not limited to, the character of the offender and the offender's criminal history, the effect of the offense on the victim and the protection of the public interest.

3. The court shall finally determine what portion, if any, of the maximum period of imprisonment should be suspended and, if a suspension order is to be entered, determine the appropriate period of probation to accompany that suspension.

[¶ 17] In addition, the court is required to articulate which sentencing goals are served by the sentence. The general purposes of sentencing are set forth in 17–A M.R.S. § 1151 (2009), which states:

The general purposes of the provisions of this part are:

1. To prevent crime through the deterrent effect of sentences, the rehabilitation of convicted persons, and the

restraint of convicted persons when required in the interest of public safety;

2. To encourage restitution in all cases in which the victim can be compensated and other purposes of sentencing can be appropriately served;

3. To minimize correctional experiences which serve to promote further criminality;

4. To give fair warning of the nature of the sentences that may be imposed on the conviction of a crime;

5. To eliminate inequalities in sentences that are unrelated to legitimate criminological goals;

6. To encourage differentiation among offenders with a view to a just individualization of sentences;

7. To promote the development of correctional programs which elicit the cooperation of convicted persons; and

8. To permit sentences that do not diminish the gravity of offenses, with reference to the factors, among others, of:

A. The age of the victim; and

B. The selection by the defendant of the person against whom the crime was committed or of the property that was damaged or otherwise affected by the crime because of the race, color, religion, sex, ancestry, national origin, physical or mental disability, sexual orientation or homelessness of that person or of the owner or occupant of that property.

Section 1151 provides the principles that guide the sentencing court at each of the three steps of the sentencing process. *State v. Gallant*, 600 A.2d 830, 831 (Me. 1991). Not all of the provisions of section 1151 are within the direct province of the sentencing court but most are. Various provisions of section 1151 may or may not be relevant depending on which step of the process is being considered and depending on the facts presented at sentencing.

■■■ [¶ 18] In the first step of the sentencing court's analysis, pursuant to section 1252–C(1), the court must determine a basic term of imprisonment by considering the particular nature and seriousness of the offense as it was committed. *State v. Dwyer*, 2009 ME 127, ¶ 35, 985 A.2d 469, 479. Some of the sentencing principles set forth in section 1151 that may be relevant to this analysis include preventing crime through the deterrent effect of sentences; restraining convicted persons when required in the interest of public safety; minimizing correctional experiences that serve to promote further criminality; and eliminating sentencing inequalities that are unrelated to legitimate criminological goals. 17–A M.R.S. § 1151(1), (3), (5). The court need not address all of these factors in any given sentence and it may address other factors. In determining the basic term the court is not to consider the subjective impact of the crime on the victim but it may take into account objective factors. *State v. Gray*, 2006 ME 29, ¶ 13, 893 A.2d 611, 616; *State v. Pfeil*, 1998 ME 245, ¶¶ 16–17, 720 A.2d 573, 577–78. The objective factors include the age or other characteristics of the victim, pursuant to section 1151(8), and the nature of the injuries inflicted, *see Pfeil*, ¶¶ 16–17, 720 A.2d at 577–78.

■■ [¶ 19] In the second step of the sentencing court's analysis, pursuant to section 1252–C(2), the court must determine the maximum period of imprisonment by considering all other relevant aggravating and mitigating factors. *State v. Downs*, 2009 ME 3, ¶ 22, 962 A.2d 950, 956. Some of the sentencing principles applicable to the determination of the maximum period of imprisonment may also be applicable to the basic term. Additional principles also may be relevant such as rehabili-

tation, restitution, and differentiation of sentences to take into account the individual circumstances of the defendant and to achieve a just outcome. 17–A M.R.S. § 1151(1), (2), (6).

[¶ 20] In the third step of the sentencing court's analysis, pursuant to section 1252–C(3), the court must determine whether any portion of the maximum sentence should be suspended and, if so, what period of probation should accompany that suspension. *Downs,* 2009 ME 3, ¶ 26, 962 A.2d at 956. In determining the final sentence as with the basic and maximum periods the court must take into account the general purposes of the sentencing provisions. *Id.* ¶ 27, 962 A.2d at 956–57.

2. Appellate Review of Sentencing

[¶ 21] By statute, our review of sentences is discretionary and limited to sentences of one year or more, with further limitations not relevant here. *See* 15 M.R.S. § 2151 (2009). The objectives for our review of sentences are mandated by statute, 15 M.R.S. § 2154 (2009), as are the factors we must consider, 15 M.R.S. § 2155 (2009). Section 2154 states:

The general objectives of sentence review by the Supreme Judicial Court are:

**1. Sentence correction.** To provide for the correction of sentences imposed without due regard for the sentencing factors set forth in this chapter;

**2. Promote respect for law.** To promote respect for law by correcting abuses of the sentencing power and by increasing the fairness of the sentencing process;

**3. Rehabilitation.** To facilitate the possible rehabilitation of an offender by reducing manifest and unwarranted inequalities among the sentences of comparable offenders; and

**4. Sentencing criteria.** To promote the development and application of criteria for sentencing which are both rational and just.

Section 2155 sets forth the factors we must consider on review, stating:

In reviewing a criminal sentence, the Supreme Judicial Court shall consider:

**1. Propriety of sentence.** The propriety of the sentence, having regard to the nature of the offense, the character of the offender, the protection of the public interest, the effect of the offense on the victim and any other relevant sentencing factors recognized under law; and

**2. Manner in which sentence was imposed.** The manner in which the sentence was imposed, including the sufficiency and accuracy of the information on which it was based.

Thus, appellate review is limited to consideration of the propriety of the sentence and the sufficiency and accuracy of the information on which it was based. We look to whether the sentencing court disregarded the statutory sentencing factors, abused its sentencing power, permitted a manifest and unwarranted inequality among sentences of comparable offenders, or acted irrationally or unjustly. 15 M.R.S. § 2154.

[¶ 22] We have previously held that we apply a different standard of review to the court's determination of the basic sentence than to the determination of the maximum sentence and the final sentence. We have held that we review the basic sentence de novo for misapplication of principle. *Dwyer,* 2009 ME 127, ¶ 35, 985 A.2d at 479 (noting that the standard of review is for misapplication of principle); *State v. Cookson,* 2003 ME 136, ¶ 38, 837 A.2d 101, 112 (noting that a review for misapplication of principle is a de novo review). In *State v. Gallant,* 600 A.2d at 831, we noted that

this review is focused on 17–A M.R.S. § 1151. Our mandate pursuant to 15 M.R.S. § 2154(1), however, is to review any part of the sentence—including the basic term, the maximum term, and the final sentence—for disregard of the relevant sentencing factors.

■ [¶ 23] Similarly our statutory mandate to correct abuses of the sentencing power and to promote the development and application of criteria that are rational and just applies to all three steps in the sentencing process. 15 M.R.S. § 2154(2), (4). Therefore, although we have held that the standard of review of abuse of discretion applies only to the maximum period of imprisonment and the final sentence, *Dwyer*, 2009 ME 127, ¶ 37, 985 A.2d at 480; *Downs*, 2009 ME 3, ¶¶ 22, 26, 962 A.2d at 956, we are statutorily mandated to review any part of the sentence, including the basic term, for an abuse of the court's sentencing power. *See* 15 M.R.S. § 2154(2); *State v. Gauthier*, 2007 ME 156, ¶ 35, 939 A.2d 77, 86 (noting that we review the overall sentence for abuse of discretion).

### 3. Propriety of Reese's Twenty–Nine–Year Sentence

[¶ 24] The permissible range for a sentence of imprisonment for Class A crimes is a definite period not to exceed thirty years. 17–A M.R.S. § 1252(2)(A) (2009). Reese requested a sentence of twenty-two years with all but twelve suspended and probation of four years. Reese argues that the court erred at each of the three steps in the sentencing process.

### a. Reese's basic period of imprisonment

■ [¶ 25] In evaluating Reese's crime on a scale of seriousness the court found that although it is possible to contemplate worse ways in which the crime could have been committed the method used by Reese involving firing multiple shots at the victim and then leaving her beside the road at night with life-threatening injuries was among the most serious. Based on that determination, the court set Reese's basic sentence at twenty-seven years.

[¶ 26] Reese makes several arguments concerning the basic sentence. First, he argues, citing *State v. Shortsleeves*, 580 A.2d 145 (Me.1990), that a sentence close to the maximum should not be imposed without findings of particular types of aggravating factors. *Shortsleeves* is distinguishable from this case, however, because *Shortsleeves* dealt with a life sentence for murder. 580 A.2d at 149–50. In *Dwyer*, we recently reaffirmed that a maximum and final life sentence for murder should not be imposed unless the court finds at least one of several aggravating factors. 2009 ME 127, ¶ 37, 985 A.2d at 480 (citing *Shortsleeves*, 580 A.2d at 149). These include premeditation-in-fact, multiple deaths, murder committed by someone previously convicted of the use of deadly force, murder accompanied by extreme cruelty, murder committed in a penal institution by an inmate, and murder of an on-duty law enforcement officer or a hostage. *Shortsleeves*, 580 A.2d at 149–50. In *Shortsleeves*, we reasoned that the additional aggravating factors must be demonstrated because of the uniquely serious impact of a life sentence as compared with a sentence of a term of years. 580 A.2d at 149.

■ [¶ 27] We decline to require any showing of particular aggravating factors when the sentence, on a Class A crime, is to a term of thirty years or less. The court need only determine, for a relatively long sentence within that range, that the crime and the manner in which it was committed place it "at the most serious end of the spectrum for purposes of a basic

sentence...." *See Dwyer*, 2009 ME 127, ¶ 41, 985 A.2d at 480. Our holding here is consistent with our decision in *Alexandre v. State*, 2007 ME 106, 927 A.2d 1155, in which we noted that the current version of section 1252(2)(A) creates a single sentencing range of zero to thirty years. *Id.* ¶ 38, 927 A.2d at 1165–66. In *Alexandre* we overruled *State v. Lewis*, 590 A.2d 149 (Me.1991), and rejected the two-tiered sentencing range that we had established in *Lewis* in interpreting a prior version of section 1252(2)(A). *Alexandre*, 2007 ME 106, ¶¶ 37–40, 927 A.2d at 1165–66.

[¶ 28] Second, Reese argues that the sentence must be vacated because the court did not compare his case with precedent or provide a sufficiently thorough comparison of his actions with other ways in which the crime could have been committed. The court was not required to do either of these. The court has wide discretion in determining the sources and types of information to consider when imposing a sentence. *State v. Rosa*, 575 A.2d 727, 730 (Me.1990). We do not require the court to make factual comparisons using precedent, *see Dwyer*, 2009 ME 127, ¶¶ 34–41, 985 A.2d at 479–81, although there may be times when appropriate case comparisons would advance the sentencing principle of eliminating significant unjustified inequalities in sentences. *See* 17–A M.R.S. § 1151(5). In addition, "the sentencing court is not required to elucidate all the possible means by which the defendant's crime may be committed, find which method of commission is worse than the defendant's or which method is the worst possible way of committing the crime...." *State v. Schofield*, 2006 ME 101, ¶ 11, 904 A.2d 409, 414. Brief comparisons such as those the court made regarding Reese's actions may be sufficient to place the crime at issue along a continuum of seriousness.

[¶ 29] Third, Reese argues that the court erred in considering the effect of the crime on the victim. However, in determining the basic sentence, the court may take into account objective facts that indicate the nature or severity of the crime. *See Gray*, 2006 ME 29, ¶ 13, 893 A.2d at 616; *Pfeil*, 1998 ME 245, ¶¶ 16–17, 720 A.2d at 577–78. The court noted that the physical and psychological damage to the victim from Reese's crime was substantial. The record of objective facts before the court at sentencing amply supported this finding. Reese shot at the victim nine times, using ammunition that causes particularly severe injuries. Two bullets struck the victim, causing life-threatening injury. He then left her along the road in the middle of the night. It was only by chance that she survived because someone stopped and summoned emergency help. She underwent extensive surgery and required a long hospital stay.

[¶ 30] The crime was also committed with cruelty because it occurred within the context of a violent relationship. Reese had previously threatened to kill the victim and on one prior occasion discharged the gun close to her. He had bought a shovel, threatened to bury her with it, and kept the shovel in their rental car. He knew she would be aware of his prior death threat as she tried to escape. The sentencing court did not disregard sentencing factors or abuse its sentencing power in imposing a basic term of imprisonment of twenty-seven years. *See* 15 M.R.S. § 2154.

b.   Reese's maximum sentence

[¶ 31] The court set the maximum sentence at twenty-nine years. The mitigating factors that Reese had advanced included family and community support, academic performance, employment, childhood trauma in witnessing a

murder, and his relatively youthful age of twenty-seven. The court rejected the assertion that Reese's age was a mitigating factor and found that the remaining mitigating factors did not outweigh the significant aggravating factors. The aggravating factors that the court found included using the victim to obtain a firearm for Reese's use when he knew that was illegal; leaving the victim along the road at night after shooting her and causing life-threatening injuries; demonstrating a lack of any genuine remorse either at the time of the crime or later; and having a substantial and serious criminal history that included convictions for felony robbery and unlawful carrying of a firearm. The court did not disregard sentencing factors and did not abuse its discretion in setting the maximum period of imprisonment at twenty-nine years. *See Dwyer*, 2009 ME 127, ¶ 41, 985 A.2d at 480–81; 17–A M.R.S. § 2154.

### c. Reese's final sentence

■ [¶ 32] The court did not order any portion of the sentence suspended because it found that Reese had not been able to avail himself of opportunities for rehabilitation in the past. The court noted essentially that when it imposes a long sentence there may be a gap of decades between the historical events on which the sentence is based and some distant future date when probation, if any is imposed as part of a sentence, would actually begin. Such is the nature of our sentencing statute which requires that all parts of the sentence be determined at the same time. *See* 17–A M.R.S. § 1252–C. Given this statutory sentencing framework, the court appropriately considered Reese's prior criminal history, along with the other facts presented at sentencing, to evaluate, in light of the sentencing factors set forth in 17–A M.R.S. § 1151, whether any portion of the sentence should be suspended.

[¶ 33] Based on Reese's prior criminal history, the court found that attempts at deterrence had been ineffective. These findings were amply supported in the record at sentencing. Reese has a criminal record that extends back to 1999. His past convictions include theft, felony forgery of a financial instrument, robbery, and a variety of other misdemeanor offenses, one of which was for unlawful carrying of a weapon. The robbery, which took place in 2001, involved shooting a BB gun toward the victim of the robbery, although the pellet did not strike the victim. Reese committed the robbery during a period when his sentence on the felony forgery had been deferred to give him an opportunity to demonstrate that he had "earned" a reduced sentence for that crime. While Reese was in custody during the investigation of the robbery, he was caught trying to destroy a police videotape showing him in a lineup. Regarding the crime of elevated aggravated assault at issue here, Reese did not accept responsibility for the crime and expressed no genuine remorse.

■ [¶ 34] Reese argues that the court failed to discuss several factors that relate to his ability to be rehabilitated, including his upbringing, education, school achievement, job training and skills, and job experience. The court is not required to discuss every argument or factor that the defendant raises, as long as it does not disregard significant and relevant sentencing factors. *See Downs*, 2009 ME 3, ¶¶ 25–27, 962 A.2d at 956–57. The court did not disregard sentencing factors or abuse its discretion in setting the final sentence at twenty-nine years. *See id.*; 15 M.R.S. § 2154.

### d. Overall sentence

■ [¶ 35] Reese's final argument is that the sentence is excessive. We review

a court's determination of the overall sentence for abuse of discretion. *Downs,* 2009 ME 3, ¶ 29, 962 A.2d at 957. For the reasons stated above, we find that the court did not abuse its discretion in imposing a twenty-nine-year sentence.

The entry is:

Judgment and sentence affirmed.